UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

           Plaintiff,

v.                                  Case No. 20-CR-169

XAVIER I. DUNCAN,

           Defendant.

## REPORT AND RECOMMENDATION

### 1. Procedural History

On September 15, 2020, the grand jury returned a one-count indictment against Xavier I. Duncan, charging him with knowingly possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (ECF No. 1.)

The firearm that forms the basis of the indictment was seized from Pamela Sanders's home after she signed a form authorizing officers to search her home. On February 22, 2021, Duncan filed a motion to suppress "evidence unlawfully obtained pursuant to an unconstitutional search and an unlawfully obtained statement." (ECF No. 16 at 1.)

In response, the government states that it does not intend to offer Duncan's on-scene statements into evidence in its case in chief. (ECF No. 20 at 6, 20, 22.) Therefore, that aspect of Duncan's motion is moot, and the court will not discuss it further. The court confines itself to a discussion of Duncan's motion to suppress evidence of a search. Although Duncan does not specify what evidence he seeks to suppress, the court presumes his motion is limited to the gun that forms the basis for the indictment.

## 2. Request for an Evidentiary Hearing

In his motion Duncan requested an evidentiary hearing.[1] Although Duncan stated in his motion that the government disagreed that an evidentiary hearing was necessary, the government failed to respond to his request for a hearing within the three days allotted under Crim. L.R. 12(c).

Ordinarily, when the government fails to timely respond to a defendant's request for an evidentiary hearing the court will grant the defendant's request. But under current conditions where in-person hearings pose logistical and safety challenges, the court chose to await full briefing before assessing whether a hearing was required. Having now reviewed the parties' briefs, the court concludes that Duncan has failed in his burden to show than evidentiary hearing is required.

---

[1] Duncan moved for an evidentiary hearing pursuant to "Eastern District Local Rule 12.3." (ECF No. 16 at 5.) This local rule was superseded more than a decade ago. The relevant current local rule is Crim. L.R. 12(c) (E.D. Wis.).

It is well-established that in federal court "[e]videntiary hearings on motions to suppress are not granted as a matter of course …." *United States v. Coleman*, 149 F.3d 674, 677 (7th Cir. 1998). "A defendant seeking an evidentiary hearing on a motion to suppress must provide sufficient information 'to enable the court to conclude that a substantial claim is presented and that there are disputed issues of material fact which will affect the outcome of the motion.'" *United States v. Juarez*, 454 F.3d 717, 719-20 (7th Cir. 2006) (quoting *Coleman*, 149 F.3d at 677). In other words, "[e]videntiary hearings are warranted only when the allegations and moving papers are sufficiently definite, specific and non-conjectural and detailed enough to enable the court to conclude that a substantial claim is presented and that there are disputed issues of material fact which will affect the outcome of the motion." *Coleman*, 149 F.3d at 677; *see also United States v. Villegas*, 388 F.3d 317, 324 (7th Cir. 2004). "Reliance on vague, conclusory allegations is insufficient." *United States v. Randle*, 966 F.2d 1209, 1212 (7th Cir. 1992).

The relevant events were video and audio recorded by body cameras worn by police officers. The parties have provided the court with these recordings. The only reason Duncan offers as to why the body camera footage might be insufficient is the observation that "the possibly vulnerable subjective state of the person who consents" may be a factor in assessing whether consent to search was voluntary. (ECF No. 16 at 6 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 229 (1973).)

3

However, Duncan has not proffered what evidence a hearing might adduce in this regard, much less shown that it is disputed or material. Most significantly, Duncan does not present any evidence, such as an affidavit from Sanders, suggesting that her consent was involuntary. *See United States v. Dotson*, No. 12-CR-58, 2012 U.S. Dist. LEXIS 191071, at *8-9 (E.D. Wis. May 3, 2012) ("For example, if a witness contends that he or she never consented to a search as is alleged in the police reports, ordinarily an affidavit from that witness will be necessary (or at a minimum, an affidavit of an investigator or attorney who interviewed that witness)."). Consequently, Duncan's request for an evidentiary hearing is denied. Although the court relies primarily on the body camera recordings, it also relies on certain police reports submitted by the parties and the parties' briefs.

3. **Facts**

At roughly mid-day on February 1, 2020, a man called 911 and reported that a man was repeatedly firing off a gun in a residential neighborhood on Milwaukee's south side. Milwaukee Police Officer Guadalupe Ramirez-Cervantes was one of the first officers to respond, and he met with the caller in the alley behind the caller's house. (*See generally* Ex. 1 (Ramirez-Cervantes's body camera video).) The caller explained that a man walked down the alley three times and each time fired a gun in the vicinity of a cemetery that was at the end of the alley.

After the last time he shot off the gun, the man returned carrying the gun and entered a house across the alley. The caller pointed to the house that the man went into

and said that he had recorded the man on his security camera. He described the man with the gun as well as another man who was with him on one of the trips.

The home that the caller identified was that of Pamela Sanders. As Ramirez-Cervantes approached the side door of the home, a man, later identified as Duncan, exited and was detained by Ramirez-Cervantes. Another officer detained a second man who had just left the house.

Sanders soon came to the door, and although what she said from behind the closed glass security door is generally unintelligible, Ramirez-Cervantes said that the officers were going to obtain a search warrant for the house. He asked Sanders to open the door so they could talk, although he said he would not go into her house if she did not want him to. Ramirez-Cervantes explained that they were investigating a report that two people were firing a gun and then went into Sanders's home.

Sanders denied that anyone went into her home carrying a gun. Ramirez-Cervantes said that they had more than enough reason to get everyone out of the house and to get a search warrant. Sanders responded that her baby has autism. When Ramirez-Cervantes said that everyone needed to get out of the house, Sanders responded that they would have to wait because her children were not dressed.

Stating that he would have to come in, Ramirez-Cervantes then proceeded to enter the home. Sanders said that the police did not have permission to enter the home, to which Ramirez-Cervantes responded, "Yeah, we do." (Ex. 18:13:10.)

The scene inside the home was chaotic. Sanders struggled to gather her children. She and the children, especially a boy who appeared to be about high school aged, appeared confused as to what was going on. And Sanders exhibited largely lackadaisical compliance with the officers' instructions. At one point, apparently frustrated with Sanders not complying with officers' instructions, Ramirez-Cervantes said to Sanders, "Look, you're about to be placed in handcuffs [unintelligible] … We're asking you to comply." (Ex. 1 at 18:15:57.)

Eventually officers performed a protective sweep of the home, and all persons in the home—Sanders, her mother, and Sanders's four children—were gathered in the living room. Ramirez-Cervantes invited everyone to sit on the couch, but he explained that first he needed to check the couch. He proceeded to search the couch and, apparently in response to Sanders arguing about or questioning what he's doing (what Sanders said is unintelligible), he explained that they were permitted to search the house for people. He then again explained to Sanders why they were there, what they were doing, and that their initial search was limited to looking for people. Sanders did not appear to fully understand what Ramirez-Cervantes was saying.

Sanders continued to pace about the living room, sometimes appearing to talk on the phone, while three of her children—a 14-year-old daughter, a son who appeared to be high school aged, and a son who appeared to be middle school aged—sat on a sofa. Sanders's mother sat on a nearby chair, and another of Sanders's sons—a toddler who

Sanders said was autistic—variably was held by family members or wandered around the room.

Ramirez-Cervantes then left and went to the caller's home, where he reviewed the security camera video. When he returned from viewing the surveillance video at the neighbor's house, the scene in Sanders's house became significantly more chaotic when Ramirez-Cervantes announced that they would be arresting Sanders's 14-year-old daughter because she was with Duncan on one of his trips to fire the gun. Family members, Sanders in particular, became very upset, denying that Sanders's daughter had been with Duncan. Sanders's agitation, her yelling and that of her family members, music playing in the background, the sobs of her daughter, and the screaming of the toddler made it very difficult for Ramirez-Cervantes to explain what was going on.

Ramirez-Cervantes soon explicitly stated that Sanders's daughter was going to be arrested unless officers were shown where the gun was or consent was given to search the home for the gun. But soon the discussion digressed to the girl explaining what happened, confirming for Sanders that Duncan had a gun and had fired it, prompting Sanders to defend her daughter.

At this point Officer Ryan Casey became involved in the discussion with Sanders, taking a decidedly different tone. (*See generally* Ex. 4 (Casey's body camera video; the subsequent facts in this section are taken from this video).) As Sanders was yelling and asserting that her daughter did nothing wrong, Casey asked calmly, "What's your name,

7

ma'am?" After her mother said, "Pam," Sanders answered, "Pamela." Casey responded, "Pam? Ok, I'm Ryan …." Casey then proceeded to calmly explain that they just wanted to get the gun out of the house for everyone's safety. This prompted Sanders and her mother to loudly deny that there was a gun in the home. "Tear this motherfucker apart! It ain't in here!" Sanders's mother exclaimed. Casey calmly persisted, expressing concern for the safety of Sanders and her children, as Officer Ramirez-Cervantes went outside after obtaining Sanders's mother's permission to look through the mother's van.

Sanders continued to appear confused. She did not appear to understand why the police wanted to search the house again when they had already searched the house. Casey and another officer explained that they had initially looked only for a person; now they wanted to look for the gun.

When Sanders became upset at the prospect of her daughter being arrested, Casey very calmly, in almost a whispered tone, assured Sanders that her daughter was not going to be arrested and told her daughter that she did not do anything wrong. Casey said he was concerned that a child would find the gun.

There were then digressions as Sanders talked with her children about unrelated matters, Casey asked Sanders for her full name and address, and Casey and one of Sanders's sons went to a back bedroom to look for the boy's sweatshirt. Casey again reassured Sanders that her daughter was not going to be arrested. Sanders proceeded to complain about Ramirez-Cervantes and Casey continued to collect basic biographical

information from Sanders's daughter. Casey stepped outside and obtained a consent form from another officer, at which point another woman, apparently a friend of Sanders, came into the home with Casey.

After Sanders recounted the events to the woman, Casey went over the consent form with Sanders. Sanders asked,

> What happened to the first one that he said was? Cuz he need to re-look his camera. He did basically say he had consent to search my house. So ya searched the first time. Cuz I gave you all consent to search the first time after he said all of what he said like he had a search warrant something or he had some paperwork that he could search. So, I said "OK, fuck it. Go ahead," just to get it over with. And I thought it would be done with then and now it's and now you all bring another piece of paper say now we need you to sign this and we need to search again.

(Ex. 4 at 18:56:48.)

Casey responded that he did not know what she was talking about, but Sanders appears to have been talking about Officer Ramirez-Cervantes telling her that officers had the right to search her house when she said they did not have "permission" to come in.

Casey proceeded to reiterate that he now wanted to do a more thorough search to make sure a gun was not in the house, and he invited Sanders to accompany the officers as they did the search. Sanders and the woman who recently arrived went into an adjacent room and talked privately. Although the dialog generally cannot be heard, it appears as if the woman encouraged Sanders to let the officers conduct a search.

When the discussion ended, Sanders and Casey went into the kitchen and Casey completed the consent form. The woman encouraged Sanders to think of her kids and cautioned her that it will be worse if the officers had to get a search warrant. When Casey was done filling in the form, he read it to Sanders, explaining that she is agreeing freely and voluntarily to the search, without any threats or promises, that she had the right to end the search at any time, that she could refuse to consent, and that she could demand that the officers obtain a search warrant. Sanders then signed the form.

Casey left to complete the administrative parts of the form, tell other officers that they had obtained consent, thank the woman for her help, and talk with Sanders's mom and son. By the time Casey returned to the home a few minutes later, other officers had already found the gun in a roll of vinyl flooring by the back door.

4. Analysis

   4.1. Standing

Duncan describes himself as a "long-term guest" at Sanders's residence. (ECF No. 16 at 2.) In her discussion with Casey, Sanders said Duncan had been staying at the house, overnight, for "a couple days" and sleeping on the couch. (Ex. 4 at 18:54:07.) That is sufficient to afford him standing to challenge the search of the residence. *Minnesota v. Olson*, 495 U.S. 91, 96-97 (1990) ("status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as

reasonable"); *see also* ECF No. 24-1 (2020 W-2 form in Duncan's name identifying the residence as his address).

**4.2. Entry and Initial Search**

"Warrantless searches are *per se* unreasonable under the Fourth Amendment, unless an exception applies." *United States v. Smith*, 989 F.3d 575, ___, 2021 U.S. App. LEXIS 6166, *8 (7th Cir. 2021). The government argues that the officers' initial warrantless entry into Sanders's home was a lawful protective sweep. (ECF No. 20.) In *Maryland v. Buie*, 494 U.S. 325, 336-37 (1990), the Supreme Court approved "a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." In this regard, it is a "first cousin[]" of the principle recognized in *Terry v. Ohio*, 392 U.S. 1 (1968). *United States v. Burrows*, 48 F.3d 1011, 1016 (7th Cir. 1995).

Generally, when officers perform a protective sweep they are already lawfully in the residence (for example, in conjunction with an arrest). *See, e.g.*, *Buie*, 494 U.S. at 336-37. But the Court of Appeals for the Seventh Circuit has interpreted the protective sweep doctrine as authorizing officers to enter homes in certain instances. *See United States v. Henderson*, 748 F.3d 788, 791 (7th Cir. 2014); *see also Burrows*, 48 F.3d at 1016 ("We have also recognized that officers may be at as much risk while in the area immediately outside the arrestee's dwelling as they are within it. 'A bullet fired at an arresting officer standing

outside a window is as deadly as one that is projected from one room to another.'" (quoting *United States v. Hoyos*, 892 F.2d 1387, 1397 (9th Cir. 1989)).

Having said that, Fourth Amendment jurisprudence generally recognizes a sacrosanct privacy interest in one's home. *United States v. Contreras*, 820 F.3d 255, 261 (7th Cir. 2016); *see also Payton v. New York*, 445 U.S. 573, 585 (1980) ("physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed"). Thus, when the government asserts that a warrantless entry into a home was reasonable as a protective sweep, the court must proceed cautiously lest law enforcement be led to believe that their mere presence in proximity to a home, along with reasonable suspicion, authorizes their entry into a home to conduct a protective sweep. *See Burrows*, 48 F.3d at 1017 ("We must also recognize, however, that the sweep is a device that can easily be perverted to achieve ends other than those acknowledged as legitimate in *Buie*."); cf. *United States v. Thompson*, 842 F.3d 1002, 1009 (7th Cir. 2016) (quoting *United States v. Starnes*, 741 F.3d 804, 810 (7th Cir. 2013)) ("an arrest is not a requirement for a valid protective sweep").

Thus, to avoid any unintended creeping expansion of the protective sweep doctrine, it is best to assess the officers' entry and initial search of the residence in conjunction with the related exigent circumstances doctrine.

"[A] warrantless entry by criminal law enforcement officials may be legal when there is compelling need for official action and no time to secure a warrant." *Michigan v.*

*Tyler*, 436 U.S. 499, 509 (1978). For example, "where police reasonably believe that their safety, or the safety of the public, may be threatened, exigent circumstances exist." *United States v. Huddleston*, 593 F.3d 596, 600 (7th Cir. 2010); *see also Ross*, 741 F.3d at 748 (citing *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011)) ("Exigent circumstances exist, for example, when officers are in hot pursuit of a fleeing suspect, there is a need to render emergency assistance to an injured occupant or to protect an occupant from imminent injury, or there is a need to prevent the imminent destruction of evidence.").

Here, exigent circumstances authorized the officers' initial entry into the home. A person called police, identified himself, reported two men firing a gun, stated he captured the events on a home surveillance system, gave a detailed description of the persons involved, and identified the house to which the men returned. *See United States v. Richardson*, 208 F.3d 626, 630 (7th Cir. 2000) ("911 calls reporting an emergency can be enough to support warrantless searches under the exigent circumstances exception, particularly where, as here, the caller identified himself").

After detaining two men, at least one of whom fit the description of one of the men with the gun, but not finding a gun on either man, Ramirez-Cervantes began speaking with Sanders. He initially requested that Sanders and everyone in the home come outside, but when Sanders delayed, explaining that she needed to dress her children, Ramirez-Cervantes entered the home, followed by other officers. He and other officers instructed

13

Case 2:20-cr-00169-PP   Filed 04/28/21   Page 13 of 19   Document 28

everyone to gather in the living room, invited them to sit on the couch, and then undertook a protective sweep of the residence.

Given the facially reliable information they had received, it was reasonable for the officers to enter the residence and perform a limited protective sweep to ensure an armed person was not lurking while they conducted their investigation. *Ross*, 741 F.3d at 748 ("We have found exigent circumstances justifying warrantless entries where officers fear that a gun may be fired at them or others from within the dwelling.") (citing *United States v. Kempf*, 400 F.3d 501, 503 (7th Cir. 2005) (finding exigent circumstances for warrantless entry into home where officers believed the defendant could access a potentially loaded gun inside); *United States v. Taylor*, 179 F. App'x 957, 959 (7th Cir. 2006) (finding exigent circumstances for warrantless entry into home "to ensure that no one posed a threat to them or anyone else" where, although suspect was observed leaving the house, officers knew that a gun was likely within the home); *United States v. Craig*, 12 F.3d 1101 [published in full-text format at 1993 U.S. App. LEXIS 31555], at *6 (7th Cir. 1993) (unpublished table decision) (finding exigent circumstances for officers' warrantless entry into garage because the defendant "might have been able to shoot at them from inside the garage or the house.")). Although the crime was reportedly already complete, there was a reasonable basis for officers to believe that a continuing danger existed. *See Taylor*, 179 F. App'x at 959 (discussing *Richardson*, 208 F.3d at 630).

Officers then lawfully remained in the house to maintain the scene while they either obtained consent from Sanders to search for the gun or obtained a search warrant to do so. *See Segura v. United States*, 468 U.S. 796, 798 (1984). That the officers did this inside the house rather than forcing the family, including many children, to wait outside in February was reasonable.

Because nothing of evidentiary value was recovered during the protective sweep, the warrantless entry and protective sweep are relevant only insofar as they may have affected Sanders's subsequent consent. *See Contreras*, 820 F.3d at 267-68.

**4.3. Consent**

Consent is a well-established exception to the Fourth Amendment's warrant requirement. *See, e.g., United States v. Sawyer*, 929 F.3d 497, 500 (7th Cir. 2019). However, consent must be voluntary. *United States v. Thurman*, 889 F.3d 356, 367 (7th Cir. 2018) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973)). The government has the burden to prove by a preponderance of the evidence that, under the totality of the circumstances, consent was voluntary. *Id.* (citing *United States v. Hicks*, 650 F.3d 1058, 1064 (7th Cir. 2011)). Relevant factors include (1) the age, education, and intelligence of the person consenting; (2) whether the person was advised of her constitutional rights; (3) how long the person was detained before consenting; (4) whether the person consented immediately or was prompted by repeated requests; (5) whether physical coercion was used; and (6) whether

the person was in custody when she consented. *Id*. No single factor is controlling. *Thompson*, 842 F.3d at 1010.

As is true of many police encounters, this encounter, especially initially, was chaotic and confusing. From Sanders's perspective, a bevy of armed officers had just taken over her home because someone, falsely in her initial view, reported that a man had fired off a gun and entered her house. Sanders was obviously confused and upset. Although Ramirez-Cervantes made an effort to explain why they were in her house, it is certainly understandable that Sanders did not seem to grasp what he was talking about.

Tending to weigh against finding that Sanders's consent was voluntary is the fact that, before she consented, Ramirez-Cervantes threatened to arrest Sanders's 14-year-old daughter if Sanders did not tell him where the gun was or let the officers look for it. The prospect of her daughter's arrest was obviously very upsetting to Sanders. Nonetheless, there likely was probable cause to arrest the daughter based on what he had observed on the video, *see* Wis. Stat. §§ 939.05, 941.20(1)(d).

Although Sanders was not arrested, her freedom and that of her family was restricted. The officers initially prevented her and her family from wandering through the house unaccompanied. Ramirez-Cervantes also early on in the encounter suggested that Sanders might need to be handcuffed if she did not stop moving around. And Sanders was asked for her consent multiple times by two different officers.

But there was a sea change in the tone of the conversation when Casey took over. His approach was extremely low key. He expressly and repeatedly assured both Sanders and her daughter that the daughter was not going to be arrested. While Sanders was obviously confused about the difference between the initial search and what the officers now wanted to search for, Casey took time and care to explain it to her.

Although Sanders may have had some difficulty understanding these explanations, she was 30 years old and appeared to be of sufficient intelligence to understand what was going on. Moreover, her mother was present with her and a friend soon arrived, who encouraged Sanders to let the officers search. Sanders was not under arrest and faced no threat of arrest.

Sanders's consent was preceded by multiple requests, but not multiple refusals. Officers had to ask her several times if they could look for the gun because, each time they did, rather than explicitly refusing Sanders responded by denying that there was a gun in her home, defending her daughter, and asking why officers wanted to search again.

Sanders was explicitly told of her right to refuse to consent and to revoke her consent at any time, and Casey even invited her to accompany them as they did the search. Sanders was able to consult with a friend who appeared to encourage her to consent. And although officers told Sanders that the alternative was that they would get a search warrant, which would take some time, providing such accurate information was

not coercive. *See United States v. Polnitz*, No. 17-CR-201, 2018 U.S. Dist. LEXIS 70324, at *23 (E.D. Wis. Apr. 26, 2018) (citing *United States v. Evans*, 27 F.3d 1219, 1231 (7th Cir. 1994)).

Finally, by the time Sanders consented, the household, including Sanders, had calmed significantly.

Considering all of the relevant circumstances, the government has proven by a preponderance of the evidence that Sanders's consent was voluntary. Although Sanders initially exhibited reluctance to consent to a further search of her home, it appears that was largely a result of her not believing that a gun was in her home and her not understanding why officers were asking to conduct a second search. But then her daughter acknowledged that Duncan had done exactly what the police were alleging, and Casey explained that the officers initially were looking for people but now wanted to look for the gun. This knowledge and understanding, combined with her friend's encouragement, and the recognition that the alternative was a protracted delay while officers obtained a search warrant (Sanders expressed concern of being embarrassed in front of her neighbors by having police at her house for so long), she voluntarily consented. Consent is not involuntary because it is the result of weighing costs and benefits.

Because the gun was recovered pursuant to Sanders's voluntary consent, it is therefore unnecessary to determine whether the gun would have been inevitably discovered.

5. Conclusion

**IT IS THEREFORE RECOMMENDED** that the motion to suppress (ECF No. 16) be **denied**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C) and Fed. R. Crim. P. 59(b)(2), whereby written objections to any recommendation herein or part thereof may be filed within fourteen days of service of this recommendation or prior to the Final Pretrial Conference, whichever is earlier. Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

Dated at Milwaukee, Wisconsin this 28th day of April, 2021.

_____
WILLIAM E. DUFFIN
U.S. Magistrate Judge