UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

                    Plaintiff,

                                                    Case No. 20-cr-169-pp

          v.

XAVIER I. DUNCAN,

                    Defendant.

**ORDER OVERRULING DEFENDANT'S OBJECTION (DKT. NO. 29), ADOPTING JUDGE DUFFIN'S RECOMMENDATION (DKT. NO. 28) AND DENYING DEFENDANT'S MOTION TO SUPPRESS (DKT. NO. 16)**

On February 1, 2020, the defendant was detained by officers outside of a home on Milwaukee's south side. Dkt. No. 28 at 5. Officers detained him under suspicion that he had fired a gun in the neighborhood. Id. at 4-5. Officers found a gun during a search of the home the defendant had entered and exited before being detained. Id. at 10. On September 15, 2020, the government obtained an indictment charging the defendant under 18 U.S.C. §§922(g)(1) and 924(a)(2) with being a felon in possession of a firearm. Dkt. No. 1. The defendant has asked the court to suppress the evidence seized from the home, arguing that the search of the property violated the Fourth Amendment. Dkt. No. 16.

On April 28, 2021, Magistrate Judge William E. Duffin issued a report recommending that this court deny the motion. Dkt. No. 28. The defendant

1

timely objected. Dkt. No. 29. The government responded to the objection, dkt. no. 30, and the defendant replied, dkt. no. 34.

## I.    Standard of Review

Federal Rule of Criminal Procedure 59(b) governs a district court's referral of motions to suppress to magistrate judges. Parties have fourteen days to file "specific objections" to a magistrate judge's report and recommendation to a motion to suppress. Fed. R. Crim. P. 59(b)(2). When reviewing a magistrate judge's recommendation, the district judge must review *de novo* the portions of the magistrate judge's recommendations to which a party timely objects. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(2), (3). The court may "accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1).

## II.   Background

The defendant asked the court to suppress "evidence unlawfully obtained pursuant to an unconstitutional search and an unlawfully obtained statement." Dkt. No. 16 at 1. Because the government subsequently stated that it does not plan to offer the defendant's on-scene statements into evidence, dkt. no. 20 at 6, 20, 22, Judge Duffin determined that the portion of the defendant's motion pertaining to that issue was moot, dkt. no. 28 at 2. Judge Duffin based his report and recommendation solely on the defendant's motion to suppress physical evidence. Id. Although the defendant did not specify what evidence he sought to suppress, Judge Duffin assumed the motion related solely to the gun

2

that was the subject of the charge in the indictment. Id. Judge Duffin also

denied the defendant's request for an evidentiary hearing. Id.

A.  Factual Background

On February 1, 2020, a man calling 911, reporting that he heard

gunshots in a neighborhood on Milwaukee's south side.[1] Milwaukee Police

Officer Guadalupe Ramirez-Cervantes was one of the first officers to respond to

the scene; he met with the caller by an alley behind the caller's house and the

caller explained the circumstances of the gunshots. Dkt. No. 20-1 (Ramirez-

Cervantes's body camera video). The caller told Ramirez-Cervantes that he had

seen a man walk down the alley behind his house three times and each time

heard a gunshot coming from near the cemetery at the end of the alley. Id.

After hearing the third round of gunshots, the caller saw a man carrying a gun

returning toward and entering a house across the alley. Id. The caller told

Ramirez-Cervantes that the man was wearing a gray hoodie and was

accompanied by a man in a polka dot sweatshirt. Id. The caller also stated that

he had recorded the man on his security camera and described the man as well

as a second man who had entered the alley with him. Id. The caller told the

officer that he saw a gun in the hand of the man in the grey sweatshirt and had

---

[1] No recording of the 911 call was presented to Magistrate Judge Duffin. When
the defendant pointed this out during briefing on the objection to Judge
Duffin's recommendation, the government provided the 911 recording, now on
the docket at Dkt. No. 31. It is not clear why the government did not present
this evidence to Judge Duffin, and frustrating that in the context of a request
for the court to review Judge Duffin's decision, the government presents this
court with evidence Judge Duffin did not have.

it on camera. Id. The caller then indicated to Ramirez-Cervantes which house he saw the man enter by pointing to and describing the house. Id.

Officer Ramirez-Cervantes and at least one more officer walked across the alley through the backyard of the house which the two men had allegedly entered. Id. While walking through the backyard, the officers saw two girls playing and asked where their brothers were, explaining, "the one with the gun." Id. As the officers approached the home, two men exited. Id. One of the men was wearing a grey hoodie and the other a black hoodie. Id. Upon seeing the two men, Ramirez-Cervantes detained the man in the gray hoodie, later identified as the defendant. Id. A second officer on the scene detained the man in the black sweatshirt. Id. The officers did not see or detain an individual in a polka dot sweatshirt. See id.

At this time, Pamela Sanders came to a door on the side of the house near where the two men were being detained. Id. Officer Ramirez-Cervantes began communicating with Ms. Sanders through the glass security door. See id. He told Sanders that he was going to get a search warrant and explained that the men had entered the home after firing a gun. Id. Sanders denied that anyone entered her home carrying a gun. Id. Ramirez-Cervantes then directed Sanders to get everyone out of her home. Id. The officer asked how many people were in the home, stating "we don't want anyone to get hurt" and telling her there were more officers coming. Id. The officer asked how many kids were in the home and said that he needed to make sure there was not someone in the home pointing a gun at him. Id. Sanders explained that her children were

4

not dressed and told the officers to wait. Id. Ramirez-Cervantes then told Sanders that he was going to come inside; he opened the glass security door further and entered the home into a small stairwell. Id. He entered the home at 6:13 p.m. Id. Upon his entry, Sanders stated that Ramirez-Cervantes did not have permission to enter the home, to which he responded, "Yeah, we do." Id.

Ms. Sanders continued to protest the entrance into her home. Id. When Sanders would not cooperate with the officers' instructions, Officer Ramirez-Cervantes threatened to place her in handcuffs for her non-compliance. Id. Officers then performed a protective sweep of the home, checking large spaces such as bedrooms and closets. Id. Ramirez-Cervantes quickly searched a couch in the living room before directing the family to collect on the couch. Id. When Sanders said something—either arguing about or questioning the search— Ramirez-Cervantes explained that the officers were permitted to search the house for people. Id. He then elaborated on the reason they were there, what they were doing and explained that their initial search was limited to looking for people. Id. During that time, Sanders paced around the living room and, at times, spoke on the phone. Id. The other members of the household sat around the living room. Id. The youngest child, whom Sanders said was autistic, was held by various members of the family throughout. Id.

While other officers remained in the home, Officer Ramirez-Cervantes walked back to the 911 caller's home and reviewed the security camera video. Id. The footage appeared to confirm what the 911 caller had reported. See id. Ramirez-Cervantes also saw Sanders' daughter walking with the man in the

5

gray sweatshirt on one of the trips. Id. Ramirez-Cervantes returned to Sanders'
home. Id. By this time, there were a number of officers standing in the home,
including at least one standing with a long firearm in hand. Id. As the distress
level in the home rose, Ramirez-Cervantes stated that he would arrest Sanders'
fourteen-year-old daughter unless someone either showed officers where the
gun was located or gave consent to search the home for the gun. Id. Ramirez-
Cervantes repeated this ultimatum numerous times, leading to significant
stress and chaos. See id.

Around this time, Officer Ryan Casey become involved in the discussion.
Dkt. No. 20-4 (Casey's body camera video). He spoke directly with Ms.
Sanders's mother who, along with Sanders, vehemently denied the existence of
a gun in the house. Id. At one point, the mother said, "Tear this motherfucker
apart! It ain't in here." Id. Sanders' mother then gave officers permission to look
through her van, which Officer Ramirez-Cervantes searched. Id. Sanders
remained confused about why the police wanted to search the house again, but
the officers informed her that they were now looking for a gun, rather than a
person. Id. Casey tried to de-escalate the tension by clarifying with Sanders
that her daughter was not going to be arrested. Id. He stated that he was
concerned about one of the children finding a gun. Id. A discussion ensued in
which Casey asked Sanders for her full name and address and Casey went to
the back bedroom with one of Sanders's sons to look for the son's sweatshirt.
Id. Although Casey again assured Sanders that her daughter was not going to
be arrested, the officers continued to take biographical information from the

daughter. Id. Casey then obtained a consent form from an officer outside the home and came back into the home accompanied by a presumed friend of Sanders. Id.

Officer Casey went over the consent form with Ms. Sanders as she discussed the relevant events with the friend. Id. While Casey was speaking with her, Sanders asked,

> [w]hat happened to the first one that he said was? Cuz he need to re-look his camera. He did basically say he had consent to search my house. So ya searched the first time. Cuz I gave you all consent to search the first time after he said all of what he said like he had a search warrant something or he had some paperwork that he could search. So, I said "OK, fuck it. Go ahead," just to get it over with. And I thought it would be done with then and now it's and now you all bring another piece of paper say now we need you to sign this and we need to search again.

Dkt. No. 28 at 9. Casey then informed Sanders that he wanted to do a more thorough search of the home, specifically for a gun. Dkt. No. 20-4. At that time, Sanders and her friend went into a separate room to talk, where it appears the friend may have encouraged Sanders to give her consent for the search, although at one point, the friend may have said "you have no choice." Id. After the two returned, Sanders spoke further with Casey and Casey read and explained the consent form. Id. The officers told Sanders that they wanted to find the gun and get it out of the home, indicating that getting a search warrant would mean the officers' continued presence for at least two and a half more hours. Id. At 7:05 p.m., Sanders signed the consent form while still expressing her apprehension and frustration. Id. Casey then left the home to

complete the administrative portion of the consent form. Id. The officers found a gun in a roll of excess vinyl flooring by the back door just before 7:10 p.m. Id.

B.    Defendant's Motion

The defendant's motion asked the court to "suppress evidence unlawfully obtained pursuant to an unconstitutional search . . . ." Dkt. No. 16 at 1. The defendant described Sanders as his "family member whose house [the defendant] was a long-term guest." Id. at 2. The heading of the first issue stated in the motion is, "The Warrantless Entry and Subsequent Search of the Home Violated [the Defendant's] Rights Under the Fourth Amendment." Id. at 3. The motion cites, and quotes from, cases discussing the Fourth Amendment's warrant requirement and asserts that "[t]o determine whether the consent here was tainted by the initial unlawful entry, the Court must consider the temporal proximity of the consent and the entry, the presence of intervening circumstances, and the purpose and flagrancy of the misconduct." Id. at 4 (citing Brown v. Illinois, 422 U.S. 590, 603-604 (1975)). The motion also asserts that even if the consent was not "tainted by the illegal entry, the Government must also prove that it was given freely and voluntarily." Id. (citing Bumper v. North Carolina, 391 U.S. 543, 548 (1968)).

Other than this, the motion asked for an evidentiary hearing, arguing that "the legal issues presented are heavily fact-dependent and will require the Court to consider all of the circumstances known to the officers at the moment they entered the home without a warrant [and] the voluntariness of the later-given consent to search;" the defendant asserted that the "voluntariness of the

8

giver of consent requires consideration of her subjective state of mind." Id. at 6 (citing Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973)).

C. Government's Response

The government asserted that the house the defendant had left before the shootings, and to which he had returned after, belonged to the defendant's cousin and that Pamela Sanders was the defendant's cousin's wife. Dkt. No. 20 at 2. The government first argued that the defendant had not shown that he had a reasonable expectation of privacy in that house; it argued that while the defendant had characterized himself as a "long-term guest" at Ms. Sanders's house, "the circumstances of his 'visit' as portrayed on the body camera video does not bear that out, and [the defendant] has not proffered facts sufficient to support his position." Id. at 6, 7-9.

Second, the government argued that even if the defendant did have a reasonable expectation of privacy in the house, the officers were justified in their initial entry into the house and they obtained Sanders's consent lawfully. Id. at 6-7, 9-10. The government asserted that the initial entry and search of Sanders's home was part of a "lawful protective sweep performed to dispel reasonable suspicion of danger." Id. at 9.

Third, the government argued that even if the officers' search of the home was not justified as a protective sweep, it fell within the exigent circumstances exception to the warrant requirement. Id. at 11. Fourth, the government maintained that even if the initial entry into the home was unlawful, it was Ms. Sanders's learning about the danger that might be posed to her children by a

9

gun, not the initial entry, that caused her to consent to the search. Id. at 12-13. Fifth, the government argued that Sanders's consent was free and voluntary and not tainted by the officers' initial entry into her home. Id. at 14-17. Finally, the government argued that the inevitable discovery exception would apply even if the court were to deem the consent search unlawful. Id. at 18-21.

D.    Defendant's Reply

The defendant responded that if Judge Duffin were to hold an evidentiary hearing, the defendant would "show that he is originally from Chicago and had been making forays into the Milwaukee area to look for work," and that "[i]n the days and nights leading up to the incident here, [the defendant] had been staying at the home of his cousin, Dwayne Manuel, who lived at 2345 South 31st with his partner Pamela Sanders." Dkt. No. 24 at 5. The defendant again referenced the body camera footage in which Ms. Sanders informed Officer Casey that the defendant had been staying at the house for a "couple days" and had been spending the night on the couch. Id. at 6.

The defendant then argued that he was detained outside Sanders's house, and thus that the officers' entry into Sanders's house could not have been a protective sweep. Id. at 7-8. The defendant argued that the entry into the home could not be justified by the exigent circumstances exception; because the defendant had been detained outside, there was no reason for the officers to think that anyone inside was hurt or in danger. Id. at 8-9. He argued that even if exigent circumstances justified the officers' initial entry into the

house, they did not justify the officers' "continued occupation of the home." Id.
at 9. The defendant asserted that Sanders's consent was tainted by the officers'
entry into her home against her wishes and the coercive nature of the officers'
conduct and asserted that Sanders's consent was not voluntary. Id. at 10-16.
Finally, the defendant asserted that the inevitable discovery exception did not
apply. Id. at 14-16.

### III.  Judge Duffin's Recommendation

#### A.  Recommendation

Judge Duffin first denied the defendant's request for an evidentiary
hearing, concluding that he had not met his burden to show that there was a
material factual dispute that warranted one, observing that the defendant had
not presented evidence, "such as an affidavit from Sanders, suggesting that her
consent was involuntary." Dkt. No. 28 at 2-4. Next, he settled the standing
issue, concluding that as an overnight guest in Ms. Sanders's home, the
defendant had standing to challenge the search of the residence. Dkt. No. 28 at
10 (citing Minnesota v. Olson, 495 U.S. 91, 96-97 (1990)). The remainder of his
analysis was divided into a discussion of (a) the entry and initial search and (b)
the consent.

Judge Duffin first considered the officers' entry into Sanders's home and
the initial search. Explaining that the government had argued that the initial,
warrantless entry was a lawful protective sweep, id. at 11, Judge Duffin noted
that the Seventh Circuit had "interpreted the protective sweep doctrine as
authorizing officers to enter homes in certain instances," even though usually

officers performing protective sweeps already were lawfully in the residence. Id. (citations omitted). But because the Fourth Amendment "recognizes a sacrosanct privacy interest in one's home," Judge Duffin cautioned that "when the government asserts that a warrantless entry into a home was reasonable as a protective sweep, the court must proceed cautiously lest law enforcement be led to believe that their mere presence in proximity to a home, along with reasonable suspicion, authorizes their entry into a home to conduct a protective sweep." Id. at 12 (citing United States v. Burrows, 48 F.3d 1011, 1017 (7th Cir. 1995)). He concluded that "to avoid any unintended creeping expansion of the protective sweep doctrine, it is best to assess the officers' entry and initial search of the residence in conjunction with the related exigent circumstances doctrine." Id.

Describing exigent circumstances as "a compelling need for official action and not time to secure a warrant," id. at 12-13 (quoting Michigan v. Tyler, 436 U.S. 499, 509 (1978), Judge Duffin determined that exigent circumstances authorized the officers' entry:

> . . . A person called police, identified himself, reported two men firing a gun, stated he captured the events on a home surveillance system, gave a detailed description of the persons involved, and identified the house to which the men returned. *See United States v. Richardson*, 208 F.3d 626, 630 (7th Cir. 2000) ("911 calls reporting an emergency can be enough to support warrantless searches under the exigent circumstances exception, particularly where, as here, the caller identified himself.").
>
> After detaining two men, at least one of whom fit the description of one of the men with the gun, but not finding a gun on either man, Ramirez-Cervantes began speaking with Sanders. He initially requested that Sanders and everyone in the home come outside, but when Sanders delayed, explaining that she needed to

12

dress her children, Ramirez-Cervantes entered the home, followed
by other officers. He and other officers instructed everyone to gather
in the living room, invited them to sit on the couch, and then
undertook a protective sweep of the residence.

Id. at 13-14.

Judge Duffin concluded that "[g]iven the facially reliable information they
had received, it was reasonable for the officers to enter the residence and
perform a limited protective sweep to ensure an armed person was not lurking
while they conducted their investigation." Id. at 14 (citing United States v.
Ross, 741 F.3d 743, 748 (7th Cir. 2013); United States v. Kempf, 400 F.3d 501,
503 (7th Cir. 2005); United States v. Taylor, 179 F. App'x 957, 959 (7th Cir.
2006); United States v. Craig, 12 F.3d 1101, at *6 (7th Cir. 1993)). Judge
Duffin found that though the reported crime was complete, the officers had a
reasonable basis for believing that there was a continuing danger. Id. at 14.
Judge Duffin further determined that the officers lawfully remained in the
house to maintain the scene while they sought to obtain either Sanders's
consent to search or a search warrant. Id. at 15 (citing Segura v. United States,
468 U.S. 796, 798 (1984)). He stated, "That the officers did this inside the
house rather than forcing the family, including many children, to wait outside
in February was reasonable." Id. He noted that the officers did not find
anything of evidentiary value during the warrantless entry and sweep, and that
the entry and sweep were relevant "only insofar as they may have affected
Sanders's subsequent consent." Id.

Turning to consent, Judge Duffin explained that the government bore
the burden of proving by a preponderance of the evidence that Sanders's

consent was voluntary. Id. at 15 (citing United States v. Thurman, 889 F.3d 356, 367 (7th Cir. 2018)). Judge Duffin listed the relevant factors courts consider when determining whether consent is voluntary:

> (1) the age, education, and intelligence of the person consenting; (2) whether the person was advised of her constitutional rights; (3) how long the person was detained before consenting; (4) whether the person consented immediately or was prompted by repeated requests; (5) whether physician coercion was used; and (6) whether the person was in custody when she consented.

Id. at 15-16 (citing Thurman, 889 F.3d at 367).

Judge Duffin began his analysis by recognizing the chaotic nature of Sanders's encounter with the officers. Id. at 16. He observed that from her perspective, "a bevy of armed officers had just taken over her home because someone, falsely in her initial view, reported that a man had fired off a gun and entered her house;" Judge Duffin acknowledged that Sanders was "obviously confused and upset." Id. at 16. He conceded that even though Ramirez-Cervantes had tried to explain to Sanders why the officers were there, "it is certainly understandable that Sanders did not seem to grasp what he was talking about." Id.

Next, he discussed the fact that before Sanders consented, Ramirez-Cervantes threatened to arrest Sanders's fourteen-year-old daughter if someone didn't tell him where the gun was or allow the officers to search. Id. Judge Duffin found that this "tended" to weigh against a finding that Sanders's consent was voluntary, given that the "prospect of her daughter's arrest was obviously very upsetting to Sanders." Id. But he also observed that Ramirez-Cervantes likely had probable cause to arrest Sanders's daughter "based on

14

what he had observed on the video" (Sanders's daughter with one of the men). Id. (citing Wis. Stat. §§939.05, 941.20(1)(d)).

Judge Duffin next discussed the fact that while the officers had not arrested Sanders, "her freedom and that of her family was restricted." Id. He recounted that initially, the officers had prevented Sanders and her family from "wandering through the house unaccompanied," that Ramirez-Cervantes had suggested early on that if Sanders did not stop moving around she might be handcuffed and that two different officers asked Sanders for consent to search "multiple times." Id.

But Judge Duffin described a "sea change in the tone of the conversation when Casey took over." Id. at 17. He noted that Casey's tone was "extremely low key," and that Casey had repeatedly assured Sanders and her daughter that the daughter was not going to be arrested. Id. Sanders may have been confused about the difference between the initial search and why the officers wanted to search a second time, Judge Duffin said, but "Casey took time and care to explain it to her." Id.

Judge Duffin noted that Sanders was thirty years old and "appeared to be of sufficient intelligence to understand what was going on," that her mother was with her and that a friend arrived during the incident, as well as the fact that Sanders was not under arrest and "faced no threat of arrest." Id. While officers asked Sanders multiple times for consent to search, Judge Duffin noted that she did not *refuse* multiple times; every time officers asked, Sanders

"responded by denying that there was a gun in her home, defending her daughter, and asking why officers wanted to search again." Id.

Judge Duffin recounted that the officers explicitly told Sanders that she could refuse to consent and that she could revoke her consent at any time. Id. He pointed out that Casey even invited Sanders to come with the officers while they conducted the search and that they allowed her to talk to her friend. Id. While the officers told Sanders that the alternative to her consenting would be that they would have to get a search warrant, which would take time, Judge Duffin concluded that providing Sanders with accurate information was not coercive, citing United States v. Polnitz, No. 17-cr-201, 2018 U.S. Dist. LEXIS 70324, at *23 (E.D. Wis. April 26, 2018) and United States v. Evans, 27 F.3d 1219, 1231 (7th Cir. 1994)). Id. at 17-18. He also noted that by the time Sanders consented, the atmosphere in the home "had calmed significantly." Id. at 18.

Judge Duffin concluded:

> Considering all of the relevant circumstances, the government has proven by a preponderance of the evidence that Sanders's consent was voluntary. Although Sanders initially exhibited reluctance to consent to a further search of her home, it appears that was largely a result of her not believing that a gun was in her home and her not understanding why officers were asking to conduct a second search. But then her daughter acknowledged that Duncan had done exactly what the police were alleging, and Casey explained that the officers initially were looking for people but now wanted to look for the gun. This knowledge and understanding, combined with her friend's encouragement, and the recognition that the alternative was a protracted delay while officers obtained a search warrant (Sanders expressed concern of being embarrassed in front of her neighbors by having police at her house for so long), she voluntarily consented. Consent is not involuntary because it is the result of weighing costs and benefits.

16

Because the gun was recovered pursuant to Sanders's voluntary consent, it is therefore unnecessary to determine whether the gun would have been inevitably discovered.

Id. at 18-19.

B.   Defendant's Objection

The defendant has asked the court to review the recommendation *de novo*. Dkt. No. 29. The defendant states that he specifically objects to the finding that exigent circumstances justified the warrantless entry into the home, the finding that it was lawful for the officers to continue to occupy the home after the warrantless entry and the finding that Sanders voluntarily consented. Id. at 1.

The defendant asserts that the 911 call referenced by Judge Duffin is not in evidence; he asserts that the "only record of the 911 call that is before the Court is the 911 caller's calm discussion with Officer Ramirez-Cervantes when police arrived on the scene, which was captured on Officer Ramirez-Cervantes' body camera." Id. at 2. The defendant says that during that calm conversation, the 911 caller stated that two people went into the cemetery, a "whole clip" was fired, then two people walked back to 2345 South 31st Street, one of them openly carrying a gun. Id. He asserts that when another officer asked the 911 caller whether "they" were shooting "in the alley," the caller responded that they "must have been in the cemetery." Id. The defendant recounts that the caller stated that "three times they've been out shooting;" the defendant infers that there were two other shooting incidents that did not cause the 911 caller or anyone else to call the police. Id. The caller reported that one person was

17

wearing a hoodie sweatshirt with white polka dots and the other was wearing a gray hooded sweatshirt. Id. The defendant asserts that Judge Duffin did not mention the fact that before Officer Ramirez-Cervantes went into Sanders's home, he spoke "to a man who was working on a truck in the alley (*see* Dkt. #28 at 4-5), who told officers that the shooter was a black male, identified where the shooter went, and noted this was the only home on the block where a black family lived (Gov't ex. 1 at 18:06-18:07)." Id. The defendant finds it notable that the 911 caller indicated that the two men walked past the men working on the truck and that the men working on the truck "did not appear frightened or worried for their safety, as they apparently continued working on the truck." Id. at 2-3.

The defendant asserts that "[l]ess than a minute later," after finishing his conversation with the 911 caller, Officer Ramirez-Cervantes spotted, patted down and handcuffed the defendant "at the address where the only black family on the block lived." Id. at 3. The defendant was wearing a gray, hooded sweatshirt. Id. The officers also handcuffed another black male "where the only black family on the block lived; he too was wearing a hooded sweatshirt." Id.

The defendant asserts that these details are important, and characterizes the situation this way:

> The totality of the circumstances that existed at the time officers barged into Ms. Sanders' house was that one neighbor was apparently annoyed at another neighbor for firing off a gun in the nearby cemetery, but his annoyance only rose to the level of requiring police attention after the third shooting session. The 911 caller's information did not suggest that anyone had been harmed or was about to be harmed. The facts known to the officers at the time of entry were that two black men went to shoot a gun in the

18

nearby cemetery, walked calmly down the alley, returned home, and were detained by law enforcement outside the home. The lack of a true emergency is best exemplified by the fact that the men working on the truck in the alley (who were in a position to observe the gunshots and the shooter) continued carrying about their business, apparently unbothered by the shots or the shooter.

Id.

The defendant begins his legal argument by challenging Judge Duffin's conclusion that given the information the officers had received, it was reasonable for them to enter Sanders's home and perform a protective sweep to make sure there wasn't an armed person there while they conducted their investigation. Id. at 4. The defendant argues that the exigent circumstances exception is a narrow one, that "exist[s] only 'when an emergency leaves police insufficient time to seek a warrant.'" Id. (quoting Birchfield v. North Dakota, ___ U.S. ___, 136 S. Ct. 2160, 2173 (2016)). He asserts that the Supreme Court never has "broadly said that law enforcement officers may enter a *home*" when police believe their safety, or the safety of the public, may be threatened. Id. at 5. He argues that the cases Judge Duffin cited fall into two categories— emergency aid and hot pursuit—and argues that the facts of this case don't fall into either category. Id. The defendant asserts that when Officer Ramirez-Cervantes entered Sanders's home, he was investigating "the *possibility* that someone had committed a victimless misdemeanor crime," and he contends that the facts known to the officers when they entered the home did not establish probable cause to believe that a crime had been committed. Id. at 6. He asserts that when Ramirez-Cervantes entered Sanders's home, he did not know that the defendant was a felon, that he had no reason to believe the

19

concealed carry law had been violated (because the 911 caller reported that one of the men had been openly carrying a gun), that there was no evidence the gunshots endangered anyone's safety or hit someone, that the officers had no information that the shooter was impaired. Id. Thus, the defendant argues, there was no compelling need for the officers to enter the home without first getting a warrant. Id. at 7. He maintains that the "*potential* crime, if one was even committed, was already completed." Id. He states that the two men detained outside the home did not resist and were cooperative and that there was no likelihood of evidence being destroyed because "guns can't be flushed down a toilet." Id. The defendant says that "[t]aken to its logical conclusion, Judge Duffin's finding would permit the police to claim exigent circumstances whenever they suspect a gun is in a home," because the presence of a gun in a home arguably always puts people at risk, but "[g]un possession cannot give license to the Government to search a home without a warrant." Id.

The defendant next attacks the officers' continued occupation of Ms. Sanders's home. Id. at 7-8. He argues that once the officers learned that there was no armed person inside the home, asserting that any exigency had "dissipated" and the officers were not justified in "their occupation of the home." Id. at 8. He contends that a protective sweep has limits on time and place—it cannot last any "longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." Id. (citing Maryland v. Buie, 494 U.S. 325, 335-36 (1990)).

Finally, the defendant makes two separate, but overlapping, arguments as to why the court should conclude that Sanders's consent was not valid. The first argument consists of a single sentence: "[The defendant] reincorporates his previous arguments that the officer' unlawful entry tainted the consent later given by Sanders." Id. The second is that Sanders's consent was not voluntarily given because it came "after she was detained in her own home by armed agents of the state who entered against her wishes, occupied her home, threatened to handcuff her and arrest her daughter, and demanded she give consent several times." Id. The defendant argues that when these "tactics" did not work, the officers "employed the psychologically coercive good cop/bad cop routine and the 'good cop' ultimately talked Sanders into giving consent." Id.

C.    Government's Response

The government urges the court to overrule the defendant's objection. Dkt. No. 30. The government disputes the defendant's characterization that Judge Duffin expressly concluded that the officers' entry did not constitute a "protective sweep." Id. at 4. The government clarified that Judge Duffin analyzed the protective sweep doctrine in conjunction with the exigent circumstances analysis and found the entry lawful under both doctrines. Id. (citing Dkt. No. 28 at 14). The government argues that when the officers entered Sanders's home, they knew that a concerned neighbor had heard gunshots in or near the alley between his house and Sanders's house, an area located in a residential neighborhood; the neighbor had pointed the officers to Sanders's house as the house that the shooter left and returned to; the

neighbor had captured the events on his home surveillance video; while the officers had detained two men outside the house, neither had a gun; and the officers could hear voices of people inside the house, including children. Id. at 5. The government asserts that these facts could have led a reasonable officer to believe "that the shooter, or another person, was inside the house with the gun that had recently been fired in the neighborhood, and that that person could pose a danger to police (having been alerted to police presence on the scene) or to the other occupants of the house, including children." Id. The government asserts that "[a]s the officers told Ms. Sanders when they entered the house, their goal was to perform a cursory inspection into spaces where other assailants might be hiding," and thus that the entry constituted a valid protective sweep. Id.

The government expands this argument to the exigent circumstances portion of Judge Duffin's decision, proceeding through each of the cases Judge Duffin cited (and which the defendant attempted to distinguish). Id. at 6-8. The government argues that the cases support the presence of exigent circumstances; it asserts that when the police arrived at Sanders's house, they know that an armed man, who had just fired a gun several times in a residential neighborhood, recently had entered the home, that neither of the men they had detained outside had a gun and that the weapon likely was in the house—possibly in the possession of another shooter who likely had been alerted to the presence of police. Id. at 8-9. It contends that neither the fact that the crime was complete nor the lack of apparent concern among residents

22

in the area negate the exigency, arguing that "[i]t is the *officers'* objectively reasonable belief in a compelling need to act that matters." Id. at 9 (citing United States v. Huddleston, 593 F.3d 596, 600 (7th Cir. 2010)).

In response to the defendant's objections to the officers' continued presence in the home, the government asserts that the defendant waived this argument because he did not make it in his initial suppression motion. Id. at 10. It makes the same point as to any potential argument by the defendant that the officers' presence was unlawful because the initial entry was unlawful. Id. at 11. Alternatively, the government asserts that even if the defendant did not waive this argument, the argument must fail because it is underdeveloped and lacks merit. Id. at 10. The government asserts that the defendant cited to no caselaw suggesting that officers' continued presence inside the home while awaiting a warrant or consent is unlawful if the entry was lawful, reiterating Judge Duffin's finding that "officers lawfully inside a residence may 'secure the premises from within to preserve the status quo.'" Id. at 10-11 (quoting Segura v. United States, 468 U.S. 796, 798 (1984)).

The government next asserts that the defendant failed to preserve the argument that Ms. Sanders's consent was tainted by the officers' unlawful entry into the home, asserting that the defendant offered only a single, conclusory sentence about reincorporating his previous arguments. Id. at 11-12 (citing Fed. R. Crim. P. 59(b)(2); United States v. Karmo, No. 20-cr-170-1-JPS, 2021 WL 1712669, at *4 n.3 (E.D. Wis. Apr. 30, 2021)). It also argues that Sanders's consent was sufficiently distinguishable from the officers' initial

23

entry to be purged of any taint, because she agreed to the search only after she learned that a man had shot a gun outside her house and then entered the house with it, "meaning the gun could still be inside her home." Id. at 12. Sanders learning this information was, the government contends, an intervening event that rendered her consent attenuated from the circumstances surrounding the officers' entry into the home. Id. The government also argues that the officers' actions were not coercive or taken to try to obtain a confession. Id. (citing United States v. Reed, 349 F.3d 457, 465 (7th Cir. 2003)).

Finally, the government contends that Sanders consented freely and voluntarily. Id. The government reiterates that the defendant may not merely reincorporate a previous argument. Id. The government also points out that the defendant failed to address the case law or factors that formed the basis of Judge Duffin's recommendation on this issue. Id. at 12-13. The government asserts that Sanders' decision to consent was the result of her "evolving understanding of the situation, combined with her friend's encouragement and the recognition that the alternative was a protracted delay while officers obtained a search warrant." Id. at 14. It asserts that

> the entirety of the exchange between officers and Ms. Sanders, captured on body camera video, demonstrates that although Ms. Sanders was upset by police presence in her house, she was competent to understand her rights, which were explained to her in detail; she was not detained or threatened or physically coerced; and, after discussions with an officer about the potential danger to her children of a gun in the house, she freely and voluntarily consented to a search of her home to locate the gun.

Id.

D.    Defendant's Reply

The defendant reiterated his objection to Judge Duffin's decision on the protective sweep and exigent circumstances. Dkt. No. 34.

The defendant argues the protective sweep doctrine is inapplicable because the defendant was detained and handcuffed outside the home, and asserts that if the doctrine "can justify the police entering, searching, and indefinitely occupying a house after a person was detained outside the house . . . the doctrine has completely lost any mooring to the Fourth Amendment." Id. at 2-3. As for exigent circumstances, the defendant discusses the facts of several cases, concluding that the doctrine has "been subject to unintended creeping expansion." Id. at 3-5. He asserts that the exigent circumstances doctrine originated as a narrow exception to the warrant requirement and argues that "[l]ike a game of telephone, the exigent circumstances doctrine has gone from allowing law enforcement to enter a home (with consent) in fresh pursuit of an armed robber within minutes of his crime, to allowing, as here, law enforcement to enter a home without consent simply because a gun was likely in the home." Id. at 5-6. He reiterates that the court should find exigent circumstances only if an emergency leaves police with insufficient time to get a warrant. Id. at 6 (citing Birchfield, 136 S. Ct. at 2173)).

The defendant next argues that the government has not satisfied its burden of justifying the lawfulness of the officers' actions in remaining in the home. Id. at 6-7. He asserts that safety concerns no longer were justified once the officers failed to find an armed person in the house. Id. at 7.

As to the voluntariness of Ms. Sanders' consent, the defendant argues that "[e]very attenuation factor weighs in favor of a finding that Ms. Sanders' consent was tainted by the illegal entry." Id. at 7 (citing Brown v. Illinois, 422 U.S. 590, 603-04 (1975). The defendant disagrees with the government that Sanders' eventual understanding that a gun might still be inside her home constituted an "intervening event" that broke the causal chain between what he contends was an illegal entry and Sanders' subsequent consent. Id. at 8. He claims that Sanders gave her consent as the "direct result" of officers entering and occupying her home and "badgering" her to get her consent. Id. The defendant asserts that these circumstances are "a far cry" from those of other cases in which courts have found that intervening events created sufficient attenuation. Id. He further proposes that the intensity of the situation—"police officers with assault weapons flooding into a person's home against her wishes and remaining there until the person's will is overcome," the threats to handcuff Sanders and arrest her daughter, the order that people sit on the couch and the refusal to allow people to leave the room—coerced Sanders into giving her consent to search. Id. at 9. The defendant also argues that Sanders essentially was detained when the officers ordered her to sit in the living room and was told if she did not comply she would be handcuffed. Id. at 9-10.

## IV. Analysis

### A. Entry into the Home

"Warrantless searches are *per se* unreasonable under the Fourth Amendment, unless an exception applies." United States v. Smith, 989 F.3d

575, 581 (7th Cir. 2021). The protective sweep is an exception to the warrant requirement that allows officers to perform a "'quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others.'" United States v. Thompson, 842 F.3d 1002, 1008 (7th Cir. 2016) (quoting Buie, 494 U.S. at 327). But an arrest is "not a requirement for a valid protective sweep." Id. at 1009 (citing United States v. Starnes, 741 F.3d 804, 810 (7th Cir. 2013)). An officer may "perform a 'cursory visual inspection of those places in which a person might be hiding' if he has a reasonable belief, based on specific and articulable facts, 'that the area swept harbored an individual posing a danger to the officer or others.'" Id. at 1008-09 (quoting Buie, 494 U.S. at 327). The question in evaluating the validity of a protective sweep is "not whether it would have been reasonable to get a warrant, but whether the search itself was reasonable." Id. at 1009 (quoting United States v. Brown, 64 F.3d 1083, 1086 (7th Cir. 1995)). "The inquiry is an exceptionally fact-intensive one in which [the court] must analyze myriad factors including, among other considerations, the configuration of the dwelling, the general surrounding, and the opportunity for ambush." Starnes, 741 F.3d at 808. The sweep "must also be justified by more than a 'mere inchoate and unparticularized suspicion or hunch,' regarding the danger." Id. (quoting Buie, 494 U.S. at 332). It must last "no longer than is necessary to dispel the reasonable suspicion of danger." Id. (citing Buie, 494 U.S. at 335-36).

In Burrows, the Supreme Court held that "[l]aw enforcement officers have an interest in ensuring their safety when they lawfully enter a house to effect an arrest." Burrows, 48 F.3d at 1015. The Court recounted that it had "also recognized that officers may be at as much risk while in the area immediately outside the arrestee's dwelling as they are within it." Id. at 1016 (citing U.S. v. Arch, 7 F.3d 1300, 1304 (7th Cir. 1993)). In Arch, the Court observed that "[e]ven cases that countenance protective sweeps when an arrest is made just outside the home do so on the theory that the officers are as much at risk from an unexpected assault on the defendant's doorstep as they might be inside the home." Arch, 7 F.3d at 1303-04 (collecting cases). See, e.g., United States v. Hoyos, 892 F.2d 1387, 1397 (9th Cir. 1989) ("A bullet fired at an arresting officer standing outside a window is as deadly as one that is projected from one room to another.").

Finally, the court assesses all the facts surrounding an alleged protective sweep "from the perspective of the officer on the scene." Burrows, 48 F.3d at 1016. "It is the reasonableness of the officer's judgment at the time he was required to act that counts." Id.

The officers who arrived in Sanders's neighborhood that day did so because someone who lived in the area had called 911 and reported that shots were fired. Ramirez-Cervantes met with the 911 caller, who said that three times that day, a man had gone down the alley, after which the caller had heard a gunshot. The caller explained that the third time, he'd seen the man walking with the gun in his hand. The caller described the man as wearing a

28

grey hoodie and said that he was accompanied by a second man wearing a polka-dot sweatshirt. The man had entered a house; the caller pointed out the house to the officers and described the house. As Ramirez-Cervantes and another officer walked across the backyard to the house the caller had pointed out, two men came out. One of those men was wearing a grey hoodie, the other a black hoodie. Officers detained both men—the man in the grey hoodie was the defendant—but neither man had a gun and neither man wore a polka-dot sweatshirt.

At this point, under the defendant's own recitation of the facts, the officers had two eyewitnesses—the 911 caller and the man who'd been working on his truck. The 911 caller had told the officers that someone had fired a gun (more than once), after which a man matching the defendant's description had walked by openly carrying the gun and entered the house they'd just seen the defendant exit, along with a man in a polka-dot sweatshirt. The man working on the truck had told the officers that the shooter was a black male and had identified where the shooter had gone. Because neither the defendant nor the man in the black hoodie had a gun and because the man in the polka-dot sweatshirt had not come out of the house with the other two men, it was reasonable for the officers to suspect that the gun, and the man wearing the polka-dot sweatshirt, could be inside the house. The officers had detained the defendant and the other man outside of the house, in view of whoever was inside; in fact, Sanders came to glass security door near where the defendant and the other man had been detained. At that point, the officers were aware

29

that whoever was inside the house was aware that they were outside. When Ramirez-Cervantes told Sanders that someone had entered the home with a gun, she denied it; when he asked her to get everyone outside, she demurred. So the officers were standing just outside the residence, in sight of whoever was inside, with reason to believe that there was an unaccounted-for man, and an unaccounted-for gun, inside the residence.

Viewing these facts from the perspective of the officers, the court concludes that they were justified in entering the home to conduct a protective sweep. The defendants' arguments that the men working on their truck did not seem upset, or that the 911 caller spoke calmly to Ramirez-Cervantez, do not change that conclusion. The government correctly points out that the court must consider the facts from the officers' perspective. The officers had just detained two men—one of whom was the defendant—in view of the people inside a house which they had reason to believe contained a gun and the person who'd been with the defendant when he'd walked by the 911 caller carrying that gun. It would have been reasonable for the officers to be concerned that they might be targets, regardless of whether the 911 caller or the other neighbors shared that concern. After the fact, the defendant characterizes the 911 caller and the men working on the truck as annoyed neighbors, implying that the officers overreacted to a neighborhood dispute over excessive noise, a police officer responding to a "shots fired" call would have reason to view the situation differently.

The search the officers first conducted after entering the house was reasonable under those circumstances. They gathered the family on the couch and looked into rooms and closets. They did not search drawers or cabinets or small spaces. They conducted the kind of cursory visual inspection the Supreme Court described.

Even if the officers had not had reason to conduct a protective sweep, the court agrees with Judge Duffin that exigent circumstances justified their entry into the residence, for the same reasons. The exigent circumstances exception to the warrant requirement "applies when 'the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable.'" Lange v. California, ___ U.S. ___, 141 S. Ct. 2011, 2017 (2021) (quoting Kentucky v. King, 563 U.S. 452, 460 (2011)). It "enables law enforcement officers to handle 'emergenc[ies]'—situations presenting a 'compelling need for official action and no time to secure a warrant.'" Id. (quoting Riley v. California, 573 U.S. 373, 402 (2014)). In considering whether exigent circumstances existed, the court must "'examine whether an emergency justified a warrantless search in each particular case;'" the except is "'case-specific.'" Id. at 2018 (quoting Riley, 573 U.S. at 402). "Whether a 'now or never situation' actually exists—whether an officer has 'no time to secure a warrant'—depends upon facts on the ground." Id. The court looks at the totality of the circumstances "confronting the officer as he decides to make a warrantless entry." Id. The Seventh Circuit has recognized that "where police reasonably believe that their safety, or the safety of the public, may be

threatened, exigent circumstances exist." <u>Huddleston</u>, 593 F.3d at 600. "In determining whether exigent circumstances existed, courts 'analyze the situation from the perspective of the officers at the scene.'" <u>Id.</u> at 601 (quoting <u>Leaf v. Shelnutt</u>, 400 F.3d 1070, 1081 (7th Cir. 2005)).

The defendant approaches this analysis as if the officers entered the residence to search for a gun. But that was not their reason for *initially* entering the residence. Their reason for initially entering the residence was their concern that there was a *person with a gun* inside who could pose a risk to them as they were dealing with the situation outside—the defendant and the other man who'd been detained. The issue facing the officers was not whether the gun—maybe evidence of a crime, maybe not—would still be in the house after they'd gone to get a warrant. The issue facing the officers was whether they were at risk of being fired on while they determined what to do with the two men they'd detained outside. The "emergency," the "exigency," was their need to insure that the officers outside the house were not shot, or shot at, by an armed person inside the residence.

The defendant's slippery slope argument—that Judge Duffin's ruling would mean that any time there is a gun in a house, exigent circumstances exist—fails for this reason. These officers had information that someone had fired a gun, more than once, recently. They had detained the person whom the 911 caller had described as carrying the gun but had not found the gun on his person. They had information that there was a second person, but the second person they'd detained did not match that person's description. When Ramirez-

Cervantes spoke with Sanders through the door, she denied that anyone had come into the house with a gun, a statement that contradicted the 911 caller's information, and she declined to have the people in the house come outside. While she may have had good reason—it was Wisconsin winter and she had children who'd need to put on coats and boots—the officers could not be sure that that was the only reason she declined. Viewed from the perspective of the officers, their need to make sure that there was not a shooter inside the house was an exigent circumstance.

B.    Continued Presence in the Home

The defendant next argues that the officers' continued presence in the home was unlawful because it exceeded the scope of the protective sweep. Dkt. No. 29 at 7-8. As the government argues, the defendant did not raise this issue in the motion to suppress. "Arguments not made before a magistrate judge are normally waived." United States v. Melgar, 227 F.3d 1038, 1040 (7th Cir. 2000). Nonetheless, waiver is a flexible doctrine, id., and the types of concerns often present when new arguments are filed are not present here. The facts around this issue are fully developed and Judge Duffin addressed it. See id.

"Securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents." Segura, 468 U.S. at 810; Quint v. Vill. of Deerfield, 365 F. Appx. 697, 701 (7th Cir. 2010) (stating that police officers may "conduct a protective sweep and then secure the premise until a search warrant can be obtained."); United

33

States v. Alexander, 573 F.3d 465, 476 (7th Cir. 2009) ("officers who have probable cause may enter and secure the premises from within to preserve the status quo while a search warrant is obtained without violating the Fourth Amendment's prohibition of unreasonable seizures."). The question is whether the officers had and retained probable cause to "secure the premises to prevent the destruction of evidence while they sought to obtain a search warrant." Alexander, 573 F.3d at 476

"'Probable cause to search exists 'where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found.'" Id. (quoting United States v. Scott, 516 F.3d 587, 589 (7th Cir. 2009)). The court must consider whether, "given the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id. (quotation omitted).

For the officers to remain inside Sanders's home beyond the brief extent of the protective sweep, they had to have had probable cause to believe that the home contained contraband or evidence of a crime and to believe that that contraband or evidence might be destroyed or disposed of in their absence. At the time of the search, officers were not aware that the defendant was a felon and therefore prohibited from possessing a firearm. The conversation between the defendant and Officer Brian Brosseau, captured on Brosseau's bodycam footage, illustrates this fact; Brosseau asking the defendant several questions as other officers occupied the home, including whether the defendant had any

34

felonies. <u>See</u> Dkt. No. 20-2 (Brosseau's body camera video). Thus, officers must have had probable cause for a different crime.

Based on the description by the 911 caller, however, the officers had probable cause to believe that the gun had been used in the commission of a crime—a violation of Wis. Stat. §941.20(d), Endangering Safety by Use of Dangerous Weapon. Under §941.20(d), one commits a misdemeanor if that person "[w]hile on the lands of another discharges a firearm within 100 yards of any building devoted to human occupancy situated on and attached to the lands of another without the express permission of the owner or occupant of the building." The officers had information from two eyewitnesses that someone had fired a gun in a residential neighborhood—either in the alley or in the nearby cemetery—more than once. The 911 caller had seen the defendant walk by with the gun in plain view. The man working on the truck had described the shooter and where the shooter had gone. The 911 caller had seen the defendant and the man in the polka-dot sweatshirt go into Sanders's home. The officers had seen a man fitting the description of the person carrying the gun come out of Sanders's home, but that man did not have a gun.

These facts, coupled with Sanders's denial that anyone had entered her home with a gun, gave officers probable cause to believe that evidence of a crime was still inside the home. And given Sanders's insistence that no one had come into her home with a gun, and the fact that the officers could not account for the whereabouts of the man in the polka-dot sweatshirt, they had reason to be concerned that the gun could disappear in their absence.

35

C.    <u>Consent</u>

    1.    *Taint*

The defendant first asserts that Ms. Sanders' consent was tainted by what he believes the officers' allegedly unlawful entry into her home. An otherwise voluntary consent to search an area can be tainted by officers' prior unlawful entry. <u>United States v. McMillian</u>, 786 F.3d 630 (7th Cir. 2015). In determining whether the consent was tainted, the court considers: "'(1) the temporal proximity of the illegal entry and the consent, (2) the presence of intervening circumstances, and, particularly, (3) the purpose and flagrancy of the official misconduct.'" <u>Id.</u> at 638, n.6 (quoting <u>United States v. Roberles-Ortega</u>, 348 F.3d 679, 681 (7th Cir. 2003)).

The court has determined that the officers' entry into and continued presence in the home were lawful, so Sanders' consent was not inherently tainted.

    2.    *Voluntary Consent*

Consent is a valid exception to the Fourth Amendment's warrant requirement. <u>See</u> <u>Thurman</u>, 889 F.3d at 365-66. The government "must prove by a preponderance of the evidence that the [party] consented to the disputed search." <u>Thurman</u>, 889 F.3d at 366. As Judge Duffin explained, in determining whether consent was voluntary, the court considers factors such as (1) the consenting party's age, education and intelligence; (2) whether the consenting party was informed of [her] constitutional rights; (3) whether the consenting party was in custody; (4) how long she was detained; (5) whether she consented

36

immediately or after police made several requests; and (6) whether the police used physical coercion. United States v. Richards, 741 F.3d 843, 848 (7th Cir. 2014). No one factor is controlling. Id. (citing Schneckloth, 412 U.S. at 226). The court must "review these factors in the light of 'objective facts, as presented to a reasonable inquirer, that would reasonably put him or her on notice that a voluntary consent could not be given.'" Id. (quoting United States v. Grap, 403 F.3d 439, 445 (7th Cir. 2005)).

Sanders, as Judge Duffin noted, was a thirty-year-old adult. Her interactions with the officers indicate that she is of reasonable intelligence. Initially, she informed Ramirez-Cervantes that he did not have permission to enter the house and she initially protested, more than once, about the officers' presence there. She did this despite the intimidating sight of armed officers entering the house and looking around, despite Ramirez-Cervantes at one point saying that she would be handcuffed if she did not stop moving around, despite Ramirez-Cervantes at one point telling her that her fourteen-year-old daughter might be arrested. All these things were stressful and intimidating, yet Sanders did not collapse and agree to whatever the officers said. Sanders was not in custody (although she was ordered to stay in the living room in the beginning) or accused of a crime. The time during which she was sequestered to the living room was less than an hour and she was not restrained or otherwise touched by police officers at any time; there was no physical coercion. Her mother was with her. Her friend was allowed to come in the house and the two were allowed to speak semi-privately, away from police officers. Officer Casey read

37

Sanders the rights outlined on the consent form she signed, and Sanders had the opportunity to read the consent form herself. Five of the six factors weigh in favor of voluntary consent.

As to the fifth factor, officers had to make numerous requests before Sanders consented. They made these requests in what initially was an intense atmosphere during which Sanders protested the officers' entrance and search of her home. It was not always clear what the officers were asking to search for—Officer Ramirez-Cervantes made repeated requests for the gun itself, demanding that someone show him where it was. Dkt. No. 20-1. Sanders was evidently uncertain about what the officers were requesting; Officer Casey had to clarify for her why the officers wanted to conduct another search. Dkt. No. 20-4. Once he explained the difference between the initial sweep and the reason for the request for a second search, however, Sanders appeared more willing to give her consent. Id. On the one hand, the fact that officers asked several times for consent arguably weighs against a finding of voluntariness; as the defendant characterizes it, Sanders was worn down. But as Judge Duffin noted, Sanders's denials were not refusals to grant consent to search. They were denials that there was a gun in the house (resulting in confusion about what the officers wanted). It was Casey who explained to Sanders why the officers wanted to search again. By the time Sanders signed the consent form, she had been clearly advised that she did not have to consent (a fact she seemed to have known from the moment Ramirez-Cervantes entered the house) and that she could revoke that consent. True, she'd also been told that the

38

officers might camp out in her house for the next couple of hours while they waited for a warrant if she did not agree. The defendant construed this as a threat. But Sanders did not offer to let the officers search the house when Ramirez-Cervantes demanded that someone show him where the gun was. She did not offer to let the officers search when she was told she might be handcuffed. She did not offer to let the officers search when it appeared her teenaged daughter might be arrested. She consented to the search when someone took the time to explain to her, calmly and in a non-threatening manner, why the officers wanted to conduct the search.

Under the totality of these circumstances, the court concludes that the government met its burden of proving by a preponderance of the evidence that Sanders' consent was voluntary.

**V.      Conclusion**

The court **OVERRULES** the defendant's objection. Dkt. No. 29.

The court **ADOPTS** Judge Duffin's recommendation. Dkt. No. 28.

The court **DENIES** the defendant's motion to suppress evidence. Dkt. No 16.

The court will calendar a scheduling conference to discuss with counsel next steps in the case.

Dated in Milwaukee, Wisconsin this 20th day of October, 2021.

**BY THE COURT:**

_____

**HON. PAMELA PEPPER**
**Chief United States District Judge**

39